WESTERN ENGINEERING & CONSTRUCTION CO. et al. v. RISDON IRON & LOCOMOTIVE WORKS.

(Circuit Court of Appeals, Ninth Circuit. November 12, 1909.)

No. 1,696.

1. PATENTS (§ 176*)—CONSTRUCTION OF CLAIMS—GOLD DREDGER.

In the Postlethwaite patent, No. 622,532, for a gold-dredging apparatus, claim 3, which contains as one element of the combination "a perforated spray pipe leading into the separator or grizzly from the lower end thereof," the statement of the location of such pipe as entering the grizzly at the lower end thereof is in the nature of a mere description, and is not a limitation of the claim to that precise construction. (Ross, Circuit Judge, dissenting.)

[Ed. Note.—For other cases, see Patents, Cent. Dig. § 250½; Dec. Dig. § 176.*]

2. PATENTS (§ 328*)—INFRINGEMENT—GOLD DREDGER.

The Postlethwaite patent, No. 622,532, for a gold-dredging apparatus, if conceded validity, is extremely narrow, and its essence is the direct delivery of material from the grizzly with force upon the collecting tables. As so construed, *held* not infringed.

[Ed. Note.—For other cases, see Patents, Dec. Dig. § 328.*]

Appeal from the Circuit Court of the United States for the Northern District of California.

Suit in equity by the Risdon Iron & Locomotive Works against the Western Engineering & Construction Company and the Central Gold Dredging Company. Decree for complainant, and defendants appeal. Reversed.

Charles P. Eells, W. S. Goodfellow, and Francis W. Parker, for appellants.

N. A. Acker and William F. Booth, for appellee.

Charles W. Slack, John H. Miller, and William K. White, amici curiæ.

Before GILBERT and ROSS, Circuit Judges, and HUNT, District Judge.

ROSS, Circuit Judge. This suit was brought for the alleged infringement of claim 3 of certain letters patent, numbered 622,532, dated April 4, 1898, for certain new and useful improvements in gold-dredging apparatus alleged to have been invented by Robert H. Postlethwaite, who was the appellee's assignor. The patent declares:

"This invention relates to certain new and useful improvements in that class of dredgers known as 'gold dredgers,' or those used for the recovery of gold or precious metal from the beds of rivers or streams; and the improvements consist in the arrangement of parts and details of construction, as will be hereinafter fully set forth in the drawings and described and pointed out in the specification. The object of the invention is so to construct the dredge that the working of the river bottom may be accomplished with the minimum expense, in order that river beds may be successfully and profitably worked where the percentage of gold or precious metal is very small per cubic yard, or such beds as cannot be used to advantage with the dredgers now in use, owing to the fact that the expense attached to the working of the machine is greater than the value of the material recovered.

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

"In order fully to comprehend the invention, reference must be had to the accompanying sheets of drawings, wherein Fig. 1 is a side view in elevation, showing the machine or dredge in working position within a river; Fig. 2 is a top plan view of the dredge; Fig. 3 is a vertical sectional view of the rotary grizzly, showing the water pipe in elevation.

"The letter A is used to indicate the dredge boat, which carries the hereinafter described mechanism. To the lower cross-pieces, a, of the uprights, A', placed somewhat to the rear of the dredge boat center, is fulcrumed by the rod, a', the ladder, A$^2$, which ladder works vertically in the ladder way, A$^3$, formed in the forward end of the boat. This ladder is raised and lowered by means of the cable, B, connected to a cross-beam, 1, supported by uprights, 2. This cable runs under sheave, 3, connected to the lower end of the ladder, A$^2$, by the arm, 4, and over sheave, 5, suspended from the cross-beam, 1, and the free end thereof is connected to a suitable winding drum, which is driven by suitable connections from the engine of the boat. As the cable is wound upon or slackened from the drum, the ladder, A$^2$, is raised or lowered. The ladder, A$^2$, supports the endless chains, 6, which work over the rolls, 7, and over rolls or drums, 8, secured upon the cross-shaft, 9, working in bearings of cross-pieces, 10. These chains carry the cutting, scooping, or excavating buckets, 11, which cut into the bottom, B', of the river or stream, and carry the cut soil upward to the dredger. The chains carrying the buckets with their load are prevented from sagging by means of the supporting rolls, 12, journaled at given intervals along the ladder, A$^2$.

"At any given point on the boat or dredger is located the boiler, B$^2$, the steam of which is conveyed to the engine, B$^3$, by the pipe, B$^4$. On the shaft, C, of the engine are mounted the belt wheels, C', C$^2$. The larger belt wheel, C', transmits its motion to the belt wheel, D, mounted upon the shaft, D', of the force pump D$^2$, by means of the belt, D$^3$, while the belt wheel, C$^2$, has its motion transmitted to the belt wheel, E, mounted upon a cross-shaft, E', by belt, E$^2$. The cross-shaft, E', works in bearings of the standards, E$^4$, secured to the boat (only one being shown), and upon said cross-shaft is also mounted, directly behind the belt wheel, E, a second belt wheel (not shown), which is connected with the belt wheel, F, mounted upon the cross-shaft, F', by the belt, F$^2$. Consequently the motion of shaft, E', is transmitted to the shaft, F'. Upon the cross-shaft, F', is mounted the pinion, F$^4$, which meshes with the gear wheel, F$^3$, secured upon the cross-shaft, 9. By means of the mechanism just described, the movement of the engine shaft is transmitted to the cross-shaft, 9, so as to impart travel to the endless chains, A$^2$, carrying the excavating buckets, 11. As the buckets, 11, are carried by the travel of the endless chain carriers over the drums or rolls, 8, the contents thereof are emptied upon a runway or trough, G, which leads the material into the rotary 'grizzly,' G', through the forward open end thereof. This grizzly is set at a slight incline, and it is formed of meshed or reticulated material, being cylindrical in cross-section. To the upper end thereof preferably is formed the cog ring, G$^2$, which through suitable connections (not shown) is driven from the cross-shaft, 9, so as to rotate the grizzly. Into the lower open end of said grizzly projects or extends the upper end of the water supply pipe, H, which leads from the suction pump, D$^2$. This pipe extends, preferably, the entire length of the grizzly, and is run near the top thereof, being perforated throughout its length within the grizzly, so as to spray its water onto the material entering the grizzly. The water flowing from this pipe into the grizzly serves to thoroughly wash and separate the material entering therein from the trough or runway, G, and to force the finer material from the grizzly onto the separating tables or platforms, H', arranged below the grizzly. The said grizzly is held in position by the supporting frame, H$^2$, and as the same is arranged at an incline it is obvious that as the same is rotated the heavier particles, such as stones and foreign substances too large to pass through the openings of the same, will escape from the lower open end thereof, onto an inclined platform or chute, H$^3$, arranged at that end of the grizzly.

"The separating tables or platforms, H', are arranged at a gradual incline, and extend from beneath the grizzly to each side thereof. Of the tables or platforms there are a series arranged one above the other. Consequently the water and the finer material flowing from the grizzly fall upon the first of

the inclined tables or platforms, passing thereover flow onto the next, and so on until they pass off of the lower set of tables or platforms. As the fine gold or precious metal is contained in the material flowing from the grizzly, the same will be gathered or collected as the material is passed over the separating tables or platforms. The water and the base material passing from the last set of tables or platforms enter the sluiceways, $K$, $K'$ as indicated by arrows, d, and finally discharge into the sump or well, $K^2$, formed in the boat or dredge (preferably at its stem end). From this well the base material and the water are raised into the pump, $K^3$, through the stand pipe, $K^4$, and forced through the discharge pipe, $K^5$, onto the embankment, thus being prevented from flowing back into that portion of claim bottom being dredged, while the heavier material, flowing from the trough, $H^3$, is emptied into buckets, I, secured to the elevator, I', and elevated and discharged by the buckets into a runway, $I^2$, which conveys the same onto the embankment. The elevator, I', works over the rolls or wheels, h, h', secured within the upper and lower ends of the ladder, $I^3$, which ladder [line missing] -tion is imparted to the endless elevator by any suitable mechanism driven from the engine, $I^4$, of the pump, $K^3$. The discharge pipe, $K^5$, is connected to the pump, $K^3$, by a swivel joint, $h^2$, so as to be free to move in any direction, and it is raised and lowered by means of the cable, k, attached thereto, while the ladder, $I^3$, is raised and lowered by the cable, $k^2$. The water for washing the material flowing into the grizzly is drawn from the river into the suction pump through the pipe, L.

"As thus constructed, the entire operation of dredging and recovering the gold or precious metal from the river's bottom may be conducted with very little help, as the entire working of the machine is automatic, and as the worked material is carried and deposited upon the river's bank there is no danger of the working material flowing back into the pocket or hole being dredged and reworked, which would be a useless loss of time and expense. Having thus described my invention what I claim as new, and desire to secure protection in by letters patent, is: * * *

"3. In an apparatus for dredging and separating the dredged material, the combination, with a boat or platform, of a rotary grizzly or separator mounted thereon, devices for imparting rotation thereto, means for excavating and elevating the excavative material and discharging the same directly into the rotary grizzly or separator, a perforated spray pipe leading into the separator or grizzly from the lower end thereof, a pump for forcing water into said pipe and through its perforations and under disintegrating pressure onto the material fed into the grizzly or separator, collecting tables arranged below the separator or grizzly and by means of which the separated metal from the dredged material is recovered."

Not only does the patent show upon its face that it is not one of a pioneer character, but the evidence introduced in the cause shows that long before the application for the patent was filed by Postlethwaite, which was on the 6th day of July, 1897, apparatus for gold dredging was described in printed publications, and was publicly used in this country, so nearly the same as the invention claimed in the aforesaid claim 3 of the appellee's patent as, if not in truth amounting to anticipation, certainly confines the patent here in question within very narrow limits. The opinion of the court below shows that the trial judge was very much in doubt in respect to the validity of the patent, and the file wrapper introduced in evidence shows that all the expert examiners of the Patent Office held that the appellee's apparatus constituted no invention, although the Commissioner of Patents held otherwise and awarded the patent sued upon.

For the purposes of this case I shall assume its validity. Whether or not the evidence shows any infringement upon the part of the appellants depends upon the true construction to be placed upon

the claim of the patent alleged to have been infringed, to wit, claim 3 above set out. It consists, as will be seen by its perusal, of seven elements, all of which were confessedly old, to wit: (1) A boat or platform; (2) rotary grizzly or separator; (3) devices for imparting rotation thereto; (4) means for excavating and elevating the excavative material and discharging the same; (5) a perforated spray pipe; (6) a pump for forcing water into such pipe, through its perforations, onto the material fed into the grizzly or separator; and (7) collecting tables by means of which the separated metal from the dredged material is recovered. If there be anything converting such aggregation of old elements into a patentable combination, it must necessarily be one or more of the additions to or limitations upon the second, fourth, fifth, sixth, and seventh of the elements just mentioned; that is to say, the rotary grizzly or separator claimed is mounted on the boat or platform, the means for excavating, elevating, and discharging the excavative material claimed discharges such material directly into the rotary grizzly or separator, the perforated spray pipe claimed leads into the separator or grizzly from the lower end thereof, the pump for forcing water into the said pipe and through its perforations onto the material fed into the grizzly or separator is under disintegrating pressure, and the collecting tables, by means of which the separated metal from the dredged material is recovered, are arranged below the separator or grizzly.

I agree with counsel for the appellants that each and all of those limiting clauses in the claim are in the same category. It seems to be conceded by the appellee that all of them are essential parts of the claim, except that limiting the location of the perforated spray pipe, as to which it contends that it is not an essential part of claim 3, in which view it was sustained by the court below. That court, in its opinion, after referring to the fact that the spray pipe of the appellants' machine is introduced into the grizzly from the upper end thereof, instead of the lower end, said:

"It is claimed that by reason of the character of the patent (that is, by reason of the manner of describing it in the claim, and by reason of the history of the claim in its passage through the Patent Office) it must have a strict construction, and be limited strictly to the description here given—a perforated spray pipe leading into the grizzly 'from the lower end thereof,' and, as so construed, that their machine or device is not an infringement of that claim. I have examined the question, as I have all others, with a great deal of care. I am unable to coincide with the views of defendants as contended for. Of course, the claim must be strictly limited to the various elements that are set forth therein; but I do not regard this language as entering into or disclosing an element in the makeup of the machine. I think, as contended by the complainant, it is more in the nature of a mere description, one of those things which merely tends to disclose the idea of the inventor or designer at the time as to his then conception of what was the best way to introduce the particular feature of the device, but not that he intended to bind himself thereby in such a way as to be precluded from varying that method of construction, should experience or conditions show the necessity or desirability for such a change. I do not, as I say, think that feature can be regarded as an element of the claim by which complainant is limited; and I find upon an examination of the opinion by the Commissioner, in overruling the board of examiners in their rejection of the patent, that he entirely ignores that descriptive feature in this claim in his opinion. The allowance of the patent had a very long and hotly contested passage through the Patent

Office. As originally preferred, it was rejected, and then the claim was amended and rejected again by the board of examiners. It may have been rejected more than once. I do not remember as to that: but at any rate it went to the Commissioner of Patents on appeal, and the Commissioner, in arriving at his conclusion that a patent should issue, pays no attention to this feature of the claim, which is counted upon to support this defense. In this I think he was correct, and I am satisfied that that contention cannot be sustained."

As has been seen, the perforated spray pipe of claim 3 of the appellee's patent has two limitations in respect to its location: First, it enters the grizzly; and, second, it enters it from its lower end. The Mining and Scientific Press, of date October 8, 1887, introduced in evidence, gives this description of a gold dredger, which Postlethwaite admits in his testimony he had seen long before the making of his claimed invention:

"A short distance above Alexandra there is a large double action steam dredge at work, which has now been employed in dredging the bed of the river for about four years. It was constructed by Messrs. Kincaid and McQueen of Dunedin, and is well adapted for excavating auriferous drift from the beds of rivers. Indeed, this dredge is the most complete (although far from being perfect) that has yet been employed in gold mining in the colony, and from what I could learn has been successful in obtaining sufficient gold to pay the proprietors for their outlay. Not only is the dredged material lifted, but the whole of it is washed on board. Credit is due to the manufacturers of the dredge for the ingenious manner in which everything is placed so as to economize labor. There are three men on each shift, and the dredge is kept continually at work day and night, stopping only on Sundays, and when it is absolutely necessary for repairs. After lifting the wash dirt out of the river, and emptying it into a hopper, the dredged material goes through a revolving screen, and is washed on board; the large stones passing behind the dredge in one place, and the fine tailings in another.

"The dredge is 66 feet long, built of iron, having two pontoons, one at each side, extending the whole length of the hull, and about 2 feet 6 inches clear from the side, so that the total width of the hull and pontoons is 26 feet. On the deck of the dredge, framing is erected to carry the dredging shaft, hoppers, and washing apparatus. There are two sets of buckets and dredging ladders, one on each side, which work between the hull and pontoons. Each set can be worked separately or together, as required. The buckets are capable of lifting 150 tons of stuff per hour, dredging to a depth of 25 feet below the level of the water.

"The dredged material falls into a shoot, which carries it into a revolving cylinder, 4 feet in diameter and 6 feet long, made of boiler plate and perforated with holes 1 inch in diameter. This revolving cylinder has a dip or inclination toward the stern of the dredge of 1½ inches to the foot. On the inside of this cylinder short pieces of angle iron are riveted here and there all around the cylinder to prevent the stones getting away before they are properly washed.

"All the fine stuff passes through the perforated holes in the cylinder and falls on to inclined screens, thence into riffle boxes, where the gold is collected, and the tailings are carried away clear to the stern of the dredge. The large stones and coarse gravel that come through the end of the revolving cylinder pass into a shoot at the stern of the dredge, and are deposited in the river. Water for washing purposes is lifted by a centrifugal pump, and is so conveyed that jets are made to play on the screens, thereby washing the stones and coarse gravel, and carrying the gold into the riffle boxes. The riffles in these boxes are made of bar iron, laid on the flat across the box, and placed about three-eighths of an inch apart, having under them, on the bottom of the boxes, cocoanut matting. The water coming down these inclined tables forms riffles in each of the interstices, and there the gold is deposited.

"The first set of inclined tables are set across the dredge at an inclination from the outside toward the center, where the tables from each of the re-

volving screens join onto another inclined table, which carries the sluiced material into the river at the stern of the dredge. The whole of the machinery is worked by a vertical inverted compound steam engine, having cylinders of 12-inch and 22-inch diameter, respectively, and 18-inch stroke, working under pressure of 60 pounds to the square inch. A powerful double cylinder steam winch lifts and lowers the dredging ladders, as well as works the mooring chains, of which there are five in number, viz., three at the bow and two at the stern. Each chain has its own drum, which can be connected or thrown out of gear as desired. These are all under the control of one man."

In the course of his testimony Postlethwaite was questioned, and answered, among other things, as follows:

"Q. You had seen dredges before you ever manufactured this one, you had seen or heard of dredges in New Zealand, which had a continuous bucket arrangement for hoisting material, operated by power on board the dredge, a chute, or a hopper for conveying this material into the revolving screen, the revolving screen itself, and the gold-saving tables arranged below the revolving screen to receive the material that came from the screen? All those were familiar to you, were they not, before you ever manufactured your dredge at all? A. Yes. Q. And arranged in that way? A. Yes. Q. And all these on a movable boat? A. Yes. Q. Or hull? A. Yes. Q. Had you known of any device for introducing water into this screen? A. No; other than from the buckets. Q. Other than the water that accompanied the material? A. Yes; other than from the bucket. The old dredgers were very weak, and as a rule did not fill their buckets with gravel, and considerable water used to come up with it. That is simply to explain the water that was in the screen. Q. This water puddled the material in the screen as it revolved, and accompanied the finer material through the meshes onto the tables, did it? A. Any water that there was. But I would like further to explain that. One of the difficulties with water coming into a screen from a bucket is the fact that it does not come in a continuous stream, but in large rushes, which used to take some of the material right from the screen and deliver the same into the tail of the chute. That is the fundamental mistake of introducing— Q. By 'right through the screen' you mean at the end? A. At the tail end of the chute. That is one of the fundamental difficulties of delivering water from a bucket. Q. Was the lower end of the screen all closed? A. No, sir. Q. With meshes or otherwise? A. No, sir; it was open for the delivery of tailings. Q. In what way did you introduce water into this screen in the machine which you made? A. From the spray pipe. Q. In New Zealand—the one which you made in New Zealand? A. From the spray pipe. Q. Entering at which end of the revolving screen? A. I believe from the lower end. Q. How far into the revolving screen did this spray pipe extend? A. The whole distance. Q. Did the spray pipe revolve? A. No. Q. How was it perforated? A. With small holes. Q. Where? A. All along its under side. * * * Q. How was the water supplied to the pipe? A. By a pump. Q. Under what head? A. Which particular dredge are you speaking of, Mr. Eells? Q. The one you made in New Zealand; the first one that you made. A. I never asked. I think we speeded the pump to give about a 12-foot head, the equivalent of a 12-foot head. * * * Q. With regard to the Dunedin dredge shown in the Mining and Scientific Press of October, 1887, you have said, in reply to a question whether there was a spray pipe leading into the revolving screen, that you didn't think so. Do you remember examining the dredge at the time when you went aboard of her? A. Not specifically; no. I saw it. I looked over the dredge. Q. This was before your attention had been called to gold dredging as an art, and before you had evolved this device which you have referred to? A. Yes, sir. Q. It was not until three years or more thereafter that you first evolved your scheme for a dredge? A. I don't remember the exact date I was on the Dunedin; but it was before that date. Q. Before what date? A. Before 1890. Q. Do you know anything about any spray pipe then on the Dunedin? A. Well, I remember that there was a spray pipe outside of the screen. There were some other screens underneath the tables. They were called tables or screens; a sort of secondary washer. Q. You do remember **a spray pipe!**

A. Yes. Q. A few minutes ago I understood you to say that you had never known of a spray pipe in connection with any New Zealand dredge until you planned your own. A. In a screen. That was simply for a screen. Q. My question was, in or on a screen? A. Well. on a screen. Q. You did know of spraying on a screen? A. My understanding of your question was that you were referring to a circular screen, as that had been the subject of the examination. Q. And you answered with that understanding? A. Yes, sir. Q. Do you know whether the screens of the Dunedin dredge mentioned in the Mining and Scientific Press ·of October 8, 1887, were revolving screens or not? A. Yes; I think there were two revolving screens. Q. And there was a spray pipe on that revolving screen? A. No; I don't think there was. It was underneath it, underneath and to one side. Q. You are quite positive that it did not spray on the screen? A. I don't think it did; not on the revolving screen. I believe there was another screen underneath; but that I am not certain of. Q. What was the function of the screen underneath? A. A sort of secondary screener. * * * Q. Did you first get the idea of a perforated spray pipe from the Dunedin dredge? A. I could not state."

Turning to the patent itself, it is seen that the alleged inventor expressly declares that "the improvements consist in the arrangement of parts and details of construction, as will be hereinafter fully set forth in the drawings and described and pointed out in the specification," and that the annexed drawings show the perforated spray pipe entering the grizzly at its lower end. The file wrapper from the Patent Office introduced in evidence in the cause shows that it was only by so locating the perforated spray pipe that the claim was allowed. It shows that the original claims made no reference to a perforated spray pipe. The third claim was stricken out on a reference by the examiner to a patent to Robinson of September 18, 1894, and claims 3 and 4 substituted in place of it, in each of which was inserted as an element "a water supply pipe for said screen." Those claims 3 and 4 were rejected on certain references, whereupon claims 3 and 4 were stricken out and claim 3 substituted therefor, as follows:

"In an apparatus for dredging and separating the dredged material, the combination, with a boat or platform, of a rotary grizzly or separator mounted thereon, devices for imparting rotation thereto, means for excavating and elevating the excavative material and discharging the same directly into the rotary grizzly or separator, a perforated spray pipe leading into the separator or grizzly from the lower end thereof, a pump for forcing water into said pipe and through its perforations under disintegrating pressure onto the material fed into the grizzly or separator, collecting tables arranged below the separator or grizzly, and by means of which the separated metal from the dredged material is recovered."

In support of claim 3 as thus substituted the attorney for the applicant contended as follows:

"The foregoing claim is submitted for the earnest consideration of the examiner, in view of oral argument this day had. By the arrangement of the spray pipe as expressed in the foregoing claim, it will be observed that the water forced therein reacts, so to speak, and the escape of the water under pressure is throughout the length of the spray pipe at various points; the strongest jets issuing from the pipe at its lower end, or the discharge end of the grizzly. This brings the whole force of the stream, and directs the issuing jet onto the material requiring the greater amount of water and force to separate the material. As the material enters the feed end of the grizzly or separator, considerable water is carried therewith, which escapes through the mesh of the grizzly; consequently, as the material is conveyed toward the dis-

charge end of the separator, greater force is required to properly disintegrate the same. This feature is not disclosed by a single reference, nor, in fact, does either reference disclose the combination of coacting elements set forth in the above claim."

The attorney cited in support of his argument letters patent No. 615,667, granted December 13, 1898, to C. S. Barnett.

Claim 3, as so substituted, was rejected by the primary examiner, from whose decision the case was appealed to the examiners in chief. In rejecting claim 3, as the board of examiners did, they cited the dredging apparatus described in the Mining and Scientific Press of October 8, 1887, already referred to, saying that it included every element of the combination specified in claim 3 of the applicant, except " 'a perforated spray pipe leading into the separator or grizzly from the lower end thereof,' and the statement that the water is under disintegrating pressure." The examiners in chief held "that the only difference between the applicant's device and that of the publication is that he uses a perforated spray pipe leading into the rotary separator from the lower end, and discharging water under a disintegrating pressure," and, finding, further, that it was "old to introduce a perforated spraying pipe into an inclined rotary cylinder from the bottom," their conclusion was that there was no novelty in the device. In sustaining the patent, as the acting Commissioner did, on appeal to him, no reference was made to the location of the perforated spray pipe.

From what has been said in respect to the proceedings in the Patent Office, it cannot be doubted that the location of that pipe was inserted in the claim for the very purpose of securing its allowance. It was so understood by the applicant's attorney, as appears from the quotation from his argument above set out, and was so understood by the examiners, as also appears from the quotation from their decision that I have made. In Sargent v. Hall Safe & Lock Company, 114 U. S. 63, 5 Sup. Ct. 1021, 29 L. Ed. 67, it is said:

"In patents for combinations of mechanism, limitations and provisos, imposed by the inventor, especially such as were introduced into an application after it had been persistently rejected, must be strictly construed, against the inventor, and in favor of the public, and looked upon as in the nature of disclaimers."

In Walker on Patents, § 187, it is said:

"Letters patent may be construed in the light of the contemporaneous intention of the inventor and of the Patent Office; and to this end recourse may be had to the files of the application papers, to see what changes were made in the description and claims when the application was pending in the Patent Office."

To the same effect is the case of Donchian v. Kingston (C. C.) 138 Fed. 890, where it is said, on page 895:

"It would be unjust to the public, and to all the parties involved in the construction of the patent, if a patentee were allowed to 'understandingly and deliberately' limit the scope of his patent while he is obtaining it, and were afterwards allowed to escape from his limitation when the patent is construed. He ought not to be heard to demand one rule of interpretation in the Patent

Office and another in the courts. The ordinary principles relating to the interpretation of a contract are the principles which prevail in construing a patent. The understanding of the parties to an agreement at the time it is made is always held to be of importance in the construction of such agreement. Courts often find aid in construing a contract by considering what the parties have said and what they have done when the contract was made."

I am of the opinion, as has been said, that each and all of the limiting clauses in claim 3 stand upon the same footing, and that none of them can be disregarded; and, inasmuch as the record shows that the appellant's device has no perforated spray pipe entering the grizzly at its lower end, it results that there was no infringement.

Accordingly the judgment should be reversed, and cause remanded to the court below, with directions to give judgment for the defendants.

GILBERT, Circuit Judge. We are unable to agree that there was error in the conclusion of the court below that the location of the spray pipe as entering the grizzly at the lower end thereof is in the nature of a mere description, tending to show the inventor's idea of the preferable position, and that thereby the claim is not limited to that precise description. In the original application for the patent, filed on July 6, 1897, the only reference in the claims to a water supply is for "a force pump for supplying water into the grizzly to wash and separate the material fed therein." In the amendment made on December 3, 1898, "a water supply pipe" is mentioned, and in the following February claim 3 was amended so as to include "a perforated spray pipe leading into the separator or grizzly from the lower end thereof." To support the application, with the amended claims, the applicant, by his attorney, made no claim of novelty or of advantage in the fact that the pipe entered from the lower end of the grizzly. No such claim appears anywhere in the proceedings in the Patent Office. On the other hand, the applicant's contention was that his apparatus was distinguished from the prior art, in which he said water had been supplied to the grizzly for the purpose of lubricating only, or for cleansing the mesh of the separator wall, and his attorney directed attention to the fact that the applicant by the use of his force pump—

"secures a sufficiently strong stream or streams from the spray pipe to thoroughly separate and disintegrate the material. This point, we believe, is primarily new with applicant, and is absolutely essential to the successful working of applicant's apparatus."

This contention was reiterated on the appeal to the Commissioner, and it was urged that the applicant had incorporated in his machine the one feature which makes it successful—the introduction of the perforated spray pipe into the rotary grizzly, so that the work of disintegrating is very completely carried on, and all the fine material allowed to pass through the grizzly directly upon the receiving tables. The testimony all indicates that it is immaterial at which end the spray pipe is led into the grizzly, and there is nothing in the file wrapper to show that it was upon the specific location of the spray pipe as entering

from the lower end of the grizzly that invention was found or the patent was finally allowed. The objections of the examiner and the examiners in chief, upon which the application was rejected, were that the invention had been anticipated. The location of the spray pipe was treated as immaterial, and in the ruling of the examiner of February 11, 1899, it was expressly declared to be immaterial, for the reason that it made no difference, in securing the water pressure at the desired point, whether the spray pipe entered from the lower or from the upper end; and in the final ruling of the Commissioner, reversing the examiners in chief and allowing the patent, there is no reference whatever to the fact that the spray pipe enters the lower end of the grizzly. The Commissioner considered the prior art and the patents which were said to anticipate the applicant's invention, and, solely upon the claim of the applicant that his apparatus was especially adapted to the recovery of float gold, distinguished it from the prior inventions, which the Commissioner said would require changes in position in order to produce the result sought by the applicant, and in view of the assertion of the applicant that his object in forcing the water into the grizzly under pressure was to disintegrate or break up the material brought up from the bed of the river, and to force the mud and metal through the meshes of the grizzly, and thence to the collecting tables located below the grizzly, allowed the patent. Said the Commissioner:

"While the invention may be slight, yet I think appellant's claim should be allowed, that he may have an opportunity to show, if his patent be attacked, the facts that have led the courts to sustain patents for minor inventions."

We are of the opinion, therefore, that if there was invention in the appellant's combination, and the patent was properly allowed on the considerations which moved the Commissioner in granting it, it is obvious that there is nothing in the file wrapper to limit the claim in controversy to the precise position of the spray pipe therein indicated, and that infringement is not avoided by leading the pipe into the grizzly from the upper end thereof.

All of the elements of claim 3 of the Postlethwaite patent, unless it be that which calls for collecting tables arranged below the grizzly, are old. This fact was pointed out by the Commissioner of Patents on the appeal from the board of examiners, and he allowed the claim and caused the patent to issue solely upon the feature which was brought to his attention, not by the specifications in the application for the patent, but by the argument of the applicant's counsel on the appeal, that water was forced into the grizzly, through the perforated spray pipe introduced therein, with disintegrating force, so as to break the lumps of clay, stones, and sticks, and allow "the metal to pass through the meshes of the grizzly onto the tables." In view of this feature of the applicant's combination, the contention was made by his counsel that he was the first—

"to devise a machine for successfully and profitably working that class of material known as flour or float gold, which material cannot be handled by the devices disclosed by the publications or references cited."

That the patentee was not the first to introduce, with disintegrating force, water through a perforated pipe conducted into a grizzly, is shown by the patent to Kirk, in which, as the Commissioner said:

"The specification states that the water issues into the screen with sufficient force to break up the lumps of clay and gold fed into the cylinder."

But none of the prior devices delivered the disintegrated mass within the grizzly through the meshes thereof directly onto collecting tables located below it. The Commissioner seemed to be particularly impressed by the argument of counsel that the Postlethwaite invention was adapted to saving fine or float gold, and that the machines referred to as anticipating it were not so adapted. On the trial in the court below, the appellee, to sustain its patent, introduced the testimony of one Smyth, an expert, who said that the perforated spray pipe had two functions—first, as a conduit for water; and, second, as a conveyor of energy—and that the water issuing in fine jets under force through the perforations of the pipe served to force the finer material from the grizzly onto separating tables below it. He admitted that if the grizzly were rotated, and the material supplied with water, the function of washing and dissolving would be added to that of the mere receiving function of the grizzly; but he testified that, owing to the peculiar action which streams of limited diameter or spray have upon material of different sizes, the gold values in the form of very fine particles scattered through the mass of materials are sifted out therefrom, and the character of separation which then takes place is radically different from that which would take place from the mere introduction of sufficient water into the grizzly to dissolve the mass thereof. To use his own words:

"In brief, the fine particles of sand and gold will tend to take, and will in effect take, a course along the stream lines, and will be thus driven with force onto the tables beneath the grizzly as described in the patent, * * * and by the fine particles I mean, of course, the sand, including the values, ahead of the larger particles; and this position of separation is maintained till the table has performed its functions of recovering by its riffles or quicksilver, if such is used, and has secured the values."

Again, he said:

"In consequence of the fine character of the gold, it will tend to remain in suspension, if simply flowed onto it without force. The advantage of delivering it with force under the conditions described in the patent is that the fine particles are driven down onto the table and become entangled in the fiber in the rough surface of the cocoanut matting; whereas, if they were not driven with force, they would tend to remain in suspension and be carried over the expanded metal or riffles, and so be lost."

In summarizing the elements of the patented combination, he said that they were (1) a grizzly; (2) a feeder to it; (3) a pump to introduce water under disintegrating pressure; (4) a perforated spray pipe from the pump into the grizzly; (5) "gold-collecting tables below the grizzly, so as to be within the influence of the energetic stream lines from the perforated pipe." The function so attributed by this expert witness to the action of jets of water in selecting out particles of fine gold from a mass of clay, mud, sand, and rocks impresses us

as fanciful, rather than as reasonable or scientific; for the testimony is not convincing that fine jets of water directed under pressure against the material in a grizzly can have the effect to sort out of the commingled mass fine or scale gold, which will float on water, and deliver it ahead of the earth, sand, or dissolved clay. On the contrary, it would seem apparent that the jets have performed their whole function when they have washed the sticks and stones and dissolved the softer material. If, however, such selective action is to be attributed to the fine jets of water, and they do indeed force the fine gold out of the mass and ahead of the other material, it is clearly essential to their successful operation that there be collecting tables to receive the impact of the fine particles of gold before the other material again becomes commingled with it. To do this it is necessary that there be collecting tables below the grizzly, as the same witness says, "so as to be within the influence of the energetic stream lines from the perforated pipe."

In the appellant's combination, as shown in the drawings thereof, there is beneath the grizzly a closed box, into which the material discharged from the grizzly is impounded and retained until released by raising slide gates, whereupon it flows upon the saving devices. There is no testimony in the record that the appellant has operated its machine without the intervention of this box between the grizzly and the saving tables. It is evident that if, in the operation of the appellant's device, the selective action so attributed to the appellee's invention is secured, and fine particles of gold are forced ahead of the other mass of material through its grizzly by the selective action of the jets of water, the advantage thereof is wholly lost by depositing and commingling the whole mass which emerges from the grizzly into a collecting box or hopper before it is conducted upon the riffles or the saving devices. If, in other words, there has been a selection of the metal by the force of the jets through the perforated pipe of the appellant's grizzly, it is nullified by the general commingling of the whole mass under the grizzly before it flows upon the saving devices. In view of this fact, it is clear that the appellant does not infringe the appellee's patent.

This is made more apparent by the further testimony of the same expert witness in reference to the operation of other patented combinations and their adaptability to dredger mining. Referring to the De Groat patent, in which is shown a perforated pipe within a rotating grizzly supplied with water by a pump, the witness found the difference between that and the Postlethwaite device in the fact that De Groat's grizzly consists of a series of three concentric screens, and he said that:

"The number of screens would, of course, interfere with and break up the lines or streams of force in a manner which the single screen would not."

So, in distinguishing the Lay patent, in which there were shown two rotary grizzlies, both provided with perforated spray pipes, the witness pointed out the difference between that and the patent in controversy by showing that in the former the amalgamating table, while it was below the grizzly, was not adjacent thereto and did not receive

the gold-bearing residuum directly, but through a hopper or pipe or runway.

As to the Kirk patent, in which there were two perforated cylinders, one revolving within the other, with a perforated pipe within the innermost, the witness alluded to the fact that no collecting tables were shown below the grizzly, and said that the outer cylinder would contain water to some depth, the presence of which water in constant agitation would break up and destroy any selective action of strong jets of water. If it be true, therefore, that the presence of screens surrounding a grizzly will destroy the selective action of the jets of water, it follows, of course, that the presence of a hopper or a collecting device into which the mass of the material which passes through the grizzly is collected and brought to rest before it is conducted onto collecting tables will have a like effect. In short, in the appellant's combination, it is plainly to be seen that the collecting tables are not so located as to be within the influence of the energetic stream line, and that the material is not delivered with force upon the tables. If there is invention in the Postlethwaite patent, such as to entitle the appellee to protection in the use thereof, it is extremely narrow, and its essence is the direct delivery of material with force upon the collecting tables. Everything else in the combination is clearly anticipated by the prior art and patents. This particular element is not found in the appellant's combination.

It follows that the decree must be reversed, and the cause remanded, with instructions to dismiss the bill.

HUNT, District Judge, concurs with GILBERT, Circuit Judge.